1  JACOB SNOW (SBN 270988)
       jsnow@aclunc.org
2  MATTHEW T. CAGLE (SBN 286101)
       mcagle@aclunc.org
3  NICOLAS A. HIDALGO (SBN 339177)
       nhidalgo@aclunc.org
4  CHESSIE THACHER (SBN 296767)
       cthacher@aclunc.org
5  ANGELICA SALCEDA (SBN 296152)
       asalceda@aclunc.org
6  GRAYCE ZELPHIN (SBN 279112)
       gzelphin@aclunc.org
7  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION OF NORTHERN CALIFORNIA, INC.
8  39 Drumm Street
   San Francisco, CA 94111
9  Telephone: (415) 621-2493

10  *Attorneys for Movant J. Doe*

11

12                 **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 14  *In the Matter of Subpoena Number FY25-ELC-0105:* | Misc. Case No.: |
| 15  J. DOE, | **J. DOE'S NOTICE OF MOTION AND MOTION TO QUASH ADMINISTRATIVE SUBPOENA; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 16        Movant, | |
| 17      v. | |
| 18 | |
| 19  THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | Date: To be set by the Court |
| 20 | Time: To be set by the Court |
| 21        Respondent | Courtroom: To be set by the Court |

22

23

24

25

26

27

28

DOE'S NOTICE OF MOTION AND MOTION TO QUASH ADMINISTRATIVE SUBPOENA
                                                        Misc. Case No._____

**NOTICE OF MOTION AND MOTION TO QUASH**

**PLEASE TAKE NOTICE** that pursuant to 8 U.S.C. § 1346, as soon as this matter may be heard by the United State District Court for the Northern District of California, J. Doe will, and hereby does, move to quash the administrative "Immigration Enforcement" subpoena issued to Meta Platforms, Inc., dated September 3, 2025, by the Department of Homeland Security.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the Declaration of J. Doe and all exhibits attached thereto, all pleadings and papers on file in this action, and such other matters as the Court may consider.

Dated: September 18, 2025                    Respectfully submitted,

                                             AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                             OF NORTHERN CALIFORNIA, INC.


                                             */s/ Jacob Snow*
                                             Jacob Snow (SBN 270988)
                                             Matthew T. Cagle (SBN 286101)
                                             Nicolas A. Hidalgo (SBN 339177)
                                             Chessie Thacher (SBN 296767)
                                             Angelica Salceda (SBN 296152)
                                             Grayce Zelphin (SBN 279112)

                                             *Attorneys for Movant J. Doe*

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ............................................................................................................... ii

3

INTRODUCTION .............................................................................................................................. 1

4

STATEMENT OF FACTS ................................................................................................................. 3

I.    Immigration Raids in Los Angeles County. ....................................................................... 3

5

II.   The @LBProtest Account. ................................................................................................... 4

6

III.  The Subpoena and Meta's Response. .................................................................................. 5

7

ARGUMENT ...................................................................................................................................... 6

8

I.    The Subpoena Should Be Quashed Because It Infringes Doe's First Amendment Rights Without Meeting the High Burden to Compel Exposure of Doe's Identity and Associations. .................... 6

9

  A. The First Amendment Protects Doe's Right to Criticize the Government—and To Do So Anonymously. .................................................................................................................. 6

10

  B. The First Amendment Protects the Right to Record Law Enforcement and Publish That Recording. ......................................................................................................................... 8

11

12

  C. The First Amendment Protects the Right to Publish the Identity of Law Enforcement Agents..... 9

13

  D. The First Amendment Protects Doe's Right to Interact with Online Content, Curate a Feed for Followers, and Associate with Others. ...................................................................... 11

14

  E. Given the First Amendment Rights at Stake, the Subpoena Fails to Meet the High Threshold for Compelling Disclosure of Doe's Identity. ................................................. 12

15

16

II.   The Subpoena Should Be Quashed Because It Exceeds DHS's Statutory Authority.................. 15

17

  A. 8 U.S.C. § 1225(d) Does Not Permit Subpoenas to Third Parties That Would Reveal the Identity of Unknown Individuals. ...................................................................................... 16

18

  B. The Purported Investigation Into "Officer Safety" Is Outside the Authority of 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4. ........................................................................................ 17

19

III.  The Court Should Decide This Motion as Soon as Possible. ......................................... 19

20

CONCLUSION.................................................................................................................................. 21

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Cases**.............................................................................................................................**Page(s)**

3

*Abbott Laboratories v. Gardner*,

4      387 U.S. 136 (1967) ................................................................................................ 20

5      *Alvarado v. KOB-TV, L.L.C.*,
       493 F.3d 1210 (10th Cir. 2007) ........................................................................ 10, 13

6

*Americans for Prosperity Found. v. Bonta*,

7      594 U.S. 595 (2021) .......................................................................................... 14, 15

8      *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,

9      564 U.S. 721 (2011) .................................................................................................. 7

10     *Art of Living Found. v. Does 1-10*,
       2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ........................................................... 6

11

*Askins v. Dep't of Homeland Sec.*,

12     899 F.3d 1035 (9th Cir. 2018) .................................................................................. 8

13

*Bartnicki v. Vopper*,

14     532 U.S. 514 (2001) ............................................................................................ 8, 10

15     *Bates v. City of Little Rock*,
       361 U.S. 516 (1960) ................................................................................................ 12

16

17     *Bernal v. Sac. Cnty. Sheriff's Dep't*,
       73 F.4th 678 (9th Cir. 2023) ..................................................................................... 8

18

*Bland v. Roberts*,

19     730 F.3d 368 (4th Cir. 2013) .................................................................................... 9

20     *Brandenburg v. Ohio*,

21     395 U.S. 444 (1969) ................................................................................................ 13

22     *Brayshaw v. City of Tallahassee*,
       709 F. Supp. 2d 1244 (N.D. Fla. 2010) ...................................................... 9, 10, 13

23

24     *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*,
       983 F.2d 631 (5th Cir. 1993) .................................................................................. 15

25

*Bursey v. United States*,

26     466 F.2d 1059 (9th Cir. 1972) ...................................................................... 6, 12, 14

27     *Butterworth v. Smith*,
       494 U.S. 624 (1990) .................................................................................................. 7

28

*Califano v. Sanders*,
  430 U.S. 99 (1977) ........................................................................................................... 20

*City of Houston v. Hill*,
  482 U.S. 451 (1987) ........................................................................................................... 7

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994) ............................................................................................................. 8

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ........................................................................................................... 9

*Dendrite Int'l Inc. v. Doe*,
  342 N. J. Super. 134 (App. Div. 2001) ............................................................................... 6

*Doe v. 2TheMart.com Inc.*,
  140 F. Supp. 2d 1088 (W.D. Wash. 2001) .......................................................................... 7

*Doe v. S.E.C.*, No. C,
  2011 WL 5600513 (N.D. Cal. Nov. 17, 2011) ................................................................. 14

*Does I thru XXIII v. Adv. Textile Corp.*,
  214 F.3d 1058 (9th Cir. 2000) .......................................................................................... 20

*Fields v. City of Phila.*,
  862 F.3d 353 (3d Cir. 2017) ............................................................................................... 8

*Flynn v. Cable News Network*,
  621 F. Supp. 3d 432 (S.D.N.Y. 2022) ...................................................................... 9, 12, 13

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) ............................................................................................... 8

*Four Navy Seals v. Associated Press*,
  413 F. Supp. 2d 1136 (S.D. Cal. 2005) ............................................................................ 10

*Gibson v. Fla. Legislative Investigation Comm.*,
  372 U.S. 539 (1963) ................................................................................................. *passim*

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ................................................................................................ 8

*Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*,
  89 F. Supp. 2d 1144 (N.D. Cal. 2000) ........................................................................ 19, 20

*Highfields Cap. Mgmt. v. Doe*,
  385 F. Supp. 2d 969 (N.D. Cal. 2005) .................................................................. 6, 12, 14, 15

*Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston,*
    *Inc.*, 515 U.S. 557 (1995) ................................................................................................ 11

*In re DMCA § 512(h) Subpoena to Twitter, Inc.,*
    608 F. Supp. 3d ..................................................................................................... 14, 15

*In re PGS Home Co. Ltd,*
    2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) ............................................................ 14

*In re Sealed Case (Admin. Subpoena,*
    42 F.3d 1412 (D.C. Cir. 1994) ................................................................................... 15

*Index Newspapers LLC v. U.S. Marshals Serv.,*
    977 F.3d 817 (9th Cir. 2020) ........................................................................................ 8

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31,*
    585 U.S. 878 (2018) ...................................................................................................... 6

*Johnson v. Bay Area Rapid Transit Dist.,*
    724 F.3d 1159 (9th Cir. 2013) .................................................................................... 13

*Knox v. Sw. Airlines,*
    124 F.3d 1103 (9th Cir. 1997) ...................................................................................... 8

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ................................................................................................... 2, 7

*Mills v. Alabama,*
    384 U.S. 214 (1966) ...................................................................................................... 7

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) .................................................................................................... 11

*Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp.,*
    2014 WL 10319321 (E.D. Mich. July 2, 2014) ........................................................... 14

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ...................................................................................................... 7

*Naveed v. City of San Jose,*
    2016 WL 2957147 (N.D. Cal. May 23, 2016) ............................................................... 8

*Noble-Perez v. Robinson,*
    2023 WL 6194265 (C.D. Cal. Aug. 16, 2023) ............................................................... 8

*Oklahoma Publ'g Co. v. Dist. Ct.,*
    430 U.S. 308 (1977) ...................................................................................................... 9

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................................................. 7

*Peters v. United States*,
  853 F.2d 692 (9th Cir. 1988) ....................................................................... 2, 16, 18

*Pubius v. Boyer–Vine.*,
  237 F. Supp. 3d 997 (E.D. Cal 2017) ................................................................. 9, 10

*Rainsy v. Facebook, Inc.*,
  311 F. Supp. 3d 1101 (N.D. Cal. 2018) ................................................................... 8

*Rancho Publ'ns v. Superior Court*,
  68 Cal. App. 4th 1538 (1999) ............................................................................... 20

*Reno v. ACLU*,
  521 U.S. 844 (1997) ................................................................................................. 7

*Roth v. United States*,
  354 U.S. 476 (1957) ................................................................................................. 7

*Sharpe v. Winterville Police Dep't*,
  59 F.4th 674 (4th Cir. 2023) ..................................................................................... 8

*Sheehan v. Gregoire*,
  272 F. Supp. 2d 1135 (W.D. Wash. 2003) ..................................................... 9, 10, 13

*Sinclair v. TubeSockTedD*,
  596 F. Supp. 2d 128 (D.D.C. 2009) ........................................................................ 14

*Smith v. Daily Mail Publ'g Co.*,
  443 U.S. 97 (1979) ............................................................................................. 9, 10

*United States v. Bagdasarian*,
  652 F.3d 1113 (9th Cir. 2011) ................................................................................ 13

*United States v. Rumely*,
  345 U.S. 41 (1953) ................................................................................................... 6

*Vasquez Perdomo v. Noem*,
  148 F.4th 656 (9th Cir. 2025) ................................................................................... 3

*Virginia v. Black*,
  538 U.S. 343 (2003) ............................................................................................... 13

*Watts v. United States*,
  394 U.S. 705 (1969) ............................................................................................... 13

*Wearly v. Fed. Trade Comm'n*,
    616 F.2d 662 (3d Cir. 1980) ...................................................................................... 20

**Statutes** .......................................................................................................**Page(s)**

8 U.S.C. § 1225 ........................................................................................................ *passim*

8 U.S.C. § 1324c ............................................................................................................ 18

8 U.S.C. § 1325 .............................................................................................................. 18

8 U.S.C. § 1326 .............................................................................................................. 18

8 U.S.C. § 1327 .............................................................................................................. 18

18 U.S.C. § 41 ............................................................................................................... 18

19 U.S.C. § 1509 .......................................................................................................... 16

**Regulations** .................................................................................................**Page(s)**

8 C.F.R. § 287.2 ............................................................................................................ 18

8 C.F.R. § 287.4 ....................................................................................................... *passim*

**Other Authorities** .......................................................................................**Page(s)**

Amanda Holpuch, *Reporter Is Detained by ICE After Reporting on Immigration Protest*, New York
    Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/us/journalist-arrested-ice-georgia-mario-guevara.html .................................................................................................................. 3

*Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement*,
    Department of Homeland Security (July 11, 2025), https://perma.cc/W52R-48X ............................... 20

*Attorney General Bonta Issues Warning Amid Increased Reports of Fake ICE Officers and Other
    Immigration Scams*, State of California - Department of Justice - Office of the Attorney General (Mar.
    18, 2025), https://perma.cc/3J5L-AWLS ................................................................................. 4

Ben Makuch, *US Free-Speech Rights Shredded Despite Trump Vow to be First-Amendment Champion*,
    The Guardian (Jun. 19, 2025), https://perma.cc/F3PW-6JXK .............................................. 3

Dan Rosenzweig-Ziff, *How a Georgetown Scholar Went from 'Quiet' Researcher to Detainee*, Wash.
    Post (May 8, 2025), https://www.washingtonpost.com/education/2025/05/08/georgetown-scholar-badar-khan-suri-camera-middle-east-forum/ ........................................................................... 3

Elizabeth Weill-Greenberg, *DHS Says Filming, Posting Videos of ICE Agents Is "Doxxing," Vows
    Prosecutions*, Truthout (Sep. 10, 2025), https://perma.cc/HAA7-HMZQ ............................... 2

Forbes Breaking News, *Kristi Noem Caims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*,  (YouTube, July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ..................................................... 2, 20

Helen Jeon, *Growing calls for police to show ID and face amid rise in ICE impersonators*, NBC Los Angeles (June 23, 2025), https://www.nbclosangeles.com/news/local/growing-calls-for-police-to-identify-and-uncover-face-amid-rise-in-ice-impersonators/3730630/ ................................... 4

Hosam Elattar, *Calls for Unmasking ICE Could Grow in Orange County*, Voice of OC (Jul. 21, 2025), https://perma.cc/W4K3-Q87T ................................................................................................... 4

Jaimie Ding, *Federal Agent Fires Weapon during Immigration Stop in Southern California, Officials Say*, AP News (Aug. 18, 2025), https://perma.cc/9AF5-WTTT .............................................. 4

Jared Bennett, *LAPD Chief Instructs Officers to Verify Identity of Federal Immigration Agents*, LAist (Jul. 3, 2025), https://perma.cc/8FHW-48QV ........................................................................ 4

Jay Capian King, *The Detention of Mahmoud Khalil is a Flagrant Assault on Free Speech*, New Yorker (Mar. 14, 2025), https://perma.cc/JT7T-5SAP ............................................................... 3

John Roth, *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509*, Department of Homeland Security (Nov. 16, 2017) https://perma.cc/BDR2-U69D ................. 17

Jonah E. Bromwich et al., *Was First Amendment Violated in Student Arrests? Trump Lawyer Won't Say*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/us/student-protesters-immigration-detention-first-amendment.html ................................................................................... 3

Jose DuBose, *Woman detained by federal agents during California immigration raid faints*, KTLA, (Sept. 14, 2025), https://perma.cc/9QP4-V9QV ...................................................................... 4

Kaitlyn Huamani, *Immigrant Father of Three Marines Is Violently Detained, Injured by Federal Agents, Son Says*, L.A. Times (Jun. 23, 2025), https://perma.cc/8HF6-MWY7 ................................. 4

Matthew Cunningham-Cook, *DHS Says Masking and Posting Videos of ICE Agents is "Violence,"* Exposed by the Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/2C94-HU7M .. 3, 20

Michael Lozano, *Masked Federal Agents*, LAist, https://perma.cc/N9GG-NLH3 (last visited Sep. 16, 2025) ..................................................................................................................................... 4

Mohsen Mahdawi, *I was Detained for My Beliefs. Who Will Be Next?*, N.Y. Times Op. Ed. (May 2, 2025), https://www.nytimes.com/2025/05/02/opinion/mohsen-mahdawi-ice-detention.html ............... 3

# INTRODUCTION

Movant J. Doe ("Doe") brings this action to protect their First Amendment right to anonymously create, curate, and share content on an Instagram account using the handle "@LBProtest." Doe uses this account to communicate content that reflects their moral and political commitments, information about local events, and other material of interest. Doe's posts and reposts often express views critical of the government. *See* Declaration of J. Doe in Support of Motion to Quash ("Doe Decl.") ¶¶ 9–11.[1] On September 2, 2025, Doe reposted another Instagram user's compilation of images that seemingly showed a Border Patrol agent conducting official government business in public. *Id*. ¶ 14. This original post included the agent's name and a statement that the agent should be "welcomed to the wall of shame." *Id*. The post, and Doe's repost of it, are constitutionally protected. But in reaction to this anonymous political speech, the Department of Homeland Security ("DHS") issued an "Immigration Enforcement Subpoena" to Meta Platforms, Inc. ("Meta") on September 4, 2025. Doe Decl. Ex. A ("the Subpoena"). The Subpoena, citing 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4, demands subscriber names, e-mails, and telephone numbers associated with the @LBProtest account and five other Instagram accounts. *Id*. The Subpoena references "Officer Safety/Doxing" and states that the information is sought "[p]ursuant to an official, criminal investigation regarding officer safety." *Id.* The Subpoena includes no substantiating allegations nor any mention of a specific crime. *Id*.

Doe now files this urgent motion to protect their identity from being exposed to a government agency that is targeting Doe, and other Instagram accountholders, for doing nothing more than exercising their right to free speech. The Subpoena should be quashed in its entirety. It exceeds both constitutional and statutory limits—each of which provides an independent basis to prohibit the disclosure of Doe's identity to DHS.

With respect to constitutional limits, the Subpoena should be quashed because it strikes directly at free speech protections for both political and anonymous speech. Where, as here, a demand for disclosure implicates these constitutional interests, the government must demonstrate that the information it seeks substantially relates to a compelling government interest—a showing that DHS has

---

[1] To protect Doe's anonymity, the Doe Declaration is submitted to this Court as Exhibit A to the Declaration of Jacob Snow in Support of Motion to Quash ("Snow Decl."). *See* Snow Decl. ¶ 3.

not made. *See Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963). The First Amendment safeguards people's ability to criticize the government and speak out against what they see as injustice in their communities, to record law enforcement conducting their duties, to identify and publish the names of government agents, and to create, interact with, and elevate content on the Internet. This type of expressive activity is exactly what Doe engages in when curating and sharing content on @LBProtest. Moreover, the First Amendment's protections apply with special force to anonymous speech, as it "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 357 (1995).

And even if DHS could meet its burden to infringe Doe's constitutional rights (which it cannot), DHS lacks statutory authority to compel the information that it seeks. Neither the statutory nor the regulatory provision listed on the face of the Subpoena authorizes a third-party subpoena to reveal the identities of unknown people based on an unspecified investigation into "Officer Safety/Doxing." Section 1225(d) does not, under *Peters v. United States*, 853 F.2d 692, 693–94 (9th Cir. 1988), authorize the use of a subpoena to a third party seeking to reveal the identities of unknown people. And further, analysis of the cited authorities reflect that DHS is not empowered to use its subpoena power in service of an unspecified and unexplained criminal investigation that has no foundation in the scope of DHS's criminal authority.

DHS's disregard for constitutional protections and its willingness to exceed statutory authority seems to stem from a distaste for the content of Doe's message. In recent days, DHS has repeatedly equated the recording of government agents in public with violence and harassment against them, even though, as set forth below, such recording is unequivocally an exercise of First Amendment rights.[2] The government has also doubled down on its erroneous conflation of violence and speech by explicitly

---

[2] Elizabeth Weill-Greenberg, *DHS Says Filming, Posting Videos of ICE Agents Is "Doxxing," Vows Prosecutions*, Truthout (Sep. 10, 2025), https://perma.cc/HAA7-HMZQ; Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, (YouTube, July 12, 2025), https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations.").

promising retribution through prosecution "to the fullest extent of the law."[3] Doe is concerned that government agents are targeting, abducting, arresting, detaining, and abusing people based on nothing more than the views they express and the color of their skin.[4] Doe wants to push back against DHS and the government agents who Doe views as wreaking havoc in the greater Los Angeles community. Doe Decl. ¶ 11. But Meta's release of Doe's personal information to DHS would expose Doe to precisely the government actors that Doe is criticizing and chill lawfully protected speech. Anonymity is necessary to protect Doe from a powerful government apparatus that seeks to punish speech, like Doe's, that the government does not favor. Because of DHS's failure to meet either the constitutional or statutory requirements to identify Doe, the motion to quash should be granted.

## STATEMENT OF FACTS

### I. Immigration Raids in Los Angeles County.

Over the past few months, armed federal agents have appeared throughout Southern California wearing paramilitary gear to carry out "Operation At Large." Agents have snatched people from churches, carwashes, and ordinary places of business, spreading fear and horror through families and communities. *See Vasquez Perdomo v. Noem*, 148 F.4th 656, 663–66 (9th Cir. 2025) (describing start of raids on June 6 and federal agents' actions). As part of these raids and operations, agents have "divided into teams, composed of three to five agents, who contact individuals in public places such as streets and sidewalks, parking lots, or the publicly-accessible portions of businesses." *Id.* at 666. Often, these agents

---

[3] Matthew Cunningham-Cook, *DHS Says Making and Posting Videos of ICE Agents is "Violence,"* Exposed by the Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/7FF7-WEXX.

[4] *See, e.g.*, Jay Capian King, *The Detention of Mahmoud Khalil is a Flagrant Assault on Free Speech*, New Yorker (Mar. 14, 2025), https://perma.cc/JT7T-5SAP; Mohsen Mahdawi, *I was Detained for My Beliefs. Who Will Be Next?*, N.Y. Times Op. Ed. (May 2, 2025), https://www.nytimes.com/2025/05/02/opinion/mohsen-mahdawi-ice-detention.html; Jonah E. Bromwich et al., *Was First Amendment Violated in Student Arrests? Trump Lawyer Won't Say*, N.Y. Times (May 6, 2025), https://www.nytimes.com/2025/05/06/us/student-protesters-immigration-detention-first-amendment.html; Dan Rosenzweig-Ziff, *How a Georgetown Scholar Went from 'Quiet' Researcher to Detainee*, Wash. Post (May 8, 2025), https://www.washingtonpost.com/education/2025/05/08/georgetown-scholar-badar-khan-suri-camera-middle-east-forum/; Amanda Holpuch, *Reporter Is Detained by ICE After Reporting on Immigration Protest*, New York Times (Jun. 18, 2025), https://www.nytimes.com/2025/06/18/us/journalist-arrested-ice-georgia-mario-guevara.html; Ben Makuch, *US Free-Speech Rights Shredded Despite Trump Vow to be First-Amendment Champion*, The Guardian (Jun. 19, 2025), https://perma.cc/F3PW-6JXK.

cover their faces and wear plain clothes lacking any badge or identification, and this lack of

transparency leads to confusion and fear of law enforcement impersonation.[5]

Community members filming with their phones, along with local reporters, have sought to

inform the public and cast light on these operations, where they occur, and which federal agencies are

involved.[6] They have recorded as "dark-colored SUVs carrying masked agents with tactical vests pull[ ]

up and block[ ]" entrances and exits to a car wash.[7] They have reposted a video of a Border Patrol agent

violently punching a landscaper who he has pinned down outside an IHOP.[8] A child even filmed from

the back seat as Border Patrol agents smashed the windows of the car containing him and his father.[9]

Concerned that people will capitalize on federal agents' lack of transparency by impersonating them, the

chief of the Los Angeles Police Department has instructed officers to verify the identities of federal

immigration agents.[10] Local elected leaders are calling for federal agents to identify themselves amid

worries that constituents will be targeted by impersonators seeking to scam and commit sexual assault.[11]

## II.    The @LBProtest Account.

Doe operates the @LBProtest account to promote a website that Doe built to help people find

and participate in protests and speak out about the issues that matter to them. Doe Decl., ¶ 5. That

website, www.lbprotest.com ("LBProtest.com"), has both a global reach and a local focus on the Long

---

[5] Helen Jeon, *Growing calls for police to show ID and face amid rise in ICE impersonators*, NBC Los Angeles (June 23, 2025), https://www.nbclosangeles.com/news/local/growing-calls-for-police-to-identify-and-uncover-face-amid-rise-in-ice-impersonators/3730630/.

[6] *See, e.g.*, Michael Lozano, *Masked Federal Agents*, LAist, https://perma.cc/N9GG-NLH3 (last visited Sep. 16, 2025).

[7] Jose DuBose, *Woman detained by federal agents during California immigration raid faints*, KTLA, (Sept. 14, 2025), https://perma.cc/9QP4-V9QV.

[8] Kaitlyn Huamani, *Immigrant Father of Three Marines Is Violently Detained, Injured by Federal Agents, Son Says*, L.A. Times (Jun. 23, 2025), https://perma.cc/8HF6-MWY7 (describing a "viral video" of "a landscaper being taken down, pinned and repeatedly punched by masked federal agents in Orange County.")

[9] Jaimie Ding, *Federal Agent Fires Weapon during Immigration Stop in Southern California, Officials Say*, AP News (Aug. 18, 2025), https://perma.cc/9AF5-WTTT.

[10] Jared Bennett, *LAPD Chief Instructs Officers to Verify Identity of Federal Immigration Agents*, LAist (Jul. 3, 2025), https://perma.cc/8FHW-48QV; *see also Attorney General Bonta Issues Warning Amid Increased Reports of Fake ICE Officers and Other Immigration Scams*, State of California - Department of Justice - Office of the Attorney General (Mar. 18, 2025), https://perma.cc/3J5L-AWLS.

[11] Hosam Elattar, *Calls for Unmasking ICE Could Grow in Orange County*, Voice of OC (Jul. 21, 2025), https://perma.cc/W4K3-Q87T.

Beach community. Doe Decl. ¶ 4. Specifically, LBProtest.com provides links to upcoming events and allows viewers to search for nearby events of interest. *Id.* ¶ 5. Doe does not organize any of the events publicized on the @LBProtest Instagram account or listed on the LBProtest.com website. *Id.* ¶ 7.

In addition, Doe posts content to the @LBProtest account that reflects Doe's moral and political commitments, sense of humor, and connections to the Long Beach community. *Id.* ¶ 10. The @LBProtest account is designed to raise awareness about events of public concern in the community. *Id.* The content that appears in @LBProtest's feed includes both content that Doe creates and content that Doe reposts as part of a curated feed that the account's followers can see. *Id.*

On September 2, 2025, Doe reposted another user's Instagram post[12] that included a video compilation of images seeming to show a Border Patrol agent conducting official government business in public, the agent's purported name, and a statement that the officer should be "welcomed to the wall of shame." Doe Decl. ¶ 14. Doe did not create the video that appears in that post, but @LBProtest does appear as a "collaborator" on the post. *Id.* On Instagram, when a user creates a post they can invite other accounts to "collaborate" on that post. *Id.* ¶ 13. When the invited user accepts the collaboration, the post appears in their feed and their account name is listed among the "collaborators" on the post. *Id.* For the post in question, another user created the post and invited Doe to collaborate, Doe accepted the invitation, the post appeared on Doe's feed, and @LBProtest was listed as a collaborator. *Id.* ¶ 14. Only the original creator can change the content of the post. *Id.* ¶ 13.

**III.    The Subpoena and Meta's Response.**

On September 4, 2025, Meta received an administrative "Immigration Enforcement Subpoena" from DHS citing to 8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4. Doe Decl. ¶ 20, Ex. A. The Subpoena states that it is "In Reference To Officer Safety/Doxing: Simeon" and demands that records be produced for inspection "[p]ursuant to an official, criminal investigation regarding officer safety." *Id.* Nowhere in the Subpoena is any actual crime identified or cited. *Id.* The Subpoena specifically seeks for inspection: "subscriber names, e-mails, and telephone numbers associated as of 8/01/2025 through 09/03/2025" with six different Instagram account usernames. *Id.* On the copy of the Subpoena that Doe received from

---

[12] The post in question is available at the following link: https://www.instagram.com/p/DOIBbNukZyN/ [https://perma.cc/7EV6-KGJW]. Doe Decl. ¶ 14. Should the Court request it, Counsel can submit a digital version of the video for ease of reference.

Meta, the name "lbprotest" is the only visible account username; the other five account names are
redacted. *Id.* Meta has notified Doe that unless Doe "provides [Meta] with a file stamped copy of [a]
motion to quash" by September 19, 2025, it "will be required to respond to the legal process." *Id*. ¶ 19.

**ARGUMENT**

**I.**      **The Subpoena Should Be Quashed Because It Infringes Doe's First Amendment Rights
Without Meeting the High Burden to Compel Exposure of Doe's Identity and Associations.**

Where, as here, the government seeks information implicating First Amendment-protected
activities, the government must satisfy a high bar to compel disclosure. Specifically, an investigation
that "intrudes into the area of constitutionally protected rights of speech, press, association and petition"
requires the government to "convincingly show a substantial relation between the information sought
and a subject of overriding and compelling state interest." *Gibson*, 372 U.S. at 546; *United States v.
Rumely*, 345 U.S. 41, 46 (1953); *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972). Courts in
civil litigation where First Amendment rights are at stake similarly impose a heightened standard before
unmasking the identities of Internet users. *See, e.g.*, *Art of Living Found. v. Does 1–10*, 2011 WL
5444622, at *4 (N.D. Cal. Nov. 9, 2011); *Highfields Cap. Mgmt. v. Doe*, 385 F. Supp. 2d 969, 974–76
(N.D. Cal. 2005); *Dendrite Int'l Inc. v. Doe*, 342 N. J. Super. 134, 141–42 (App. Div. 2001). In the
present case, the Subpoena implicates Doe's First Amendment rights, including the (1) right to
anonymous online speech, (2) right to record, (3) right to publish, and (4) right to associate, but it
advances no compelling interest or substantial relation sufficient to satisfy either of these tests. The
Subpoena must therefore be quashed in its entirety.

**A.  The First Amendment Protects Doe's Right to Criticize the Government—and To
Do So Anonymously.**

"'If there is any fixed star in our constitutional constellation, it is that no official, high or petty,
can prescribe what shall be orthodox in politics . . . or other matters of opinion.'" *Janus v. Am. Fed'n of
State, Cty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) (quoting *W. Va. Bd. of Educ. v.
Barnette*, 319 U.S. 624, 642 (1943)). And yet, DHS's Subpoena demanding that Meta disclose
identifying information appears motivated by the government's disdain for Doe's viewpoint and a desire
to chill Doe's expressive conduct. By operating the @LBProtest account to raise "community

awareness" about Border Patrol agents roving the greater Los Angeles area, Doe is speaking critically of the government and hoping to contribute to a recognition that the abuses they saw were unjust. Doe Decl. ¶ 11.

The First Amendment exists to protect precisely this type of "free discussion of governmental affairs." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). It assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States,* 354 U.S. 476, 484 (1957). The discussion of "information relating to alleged governmental misconduct" in particular "has traditionally been recognized as lying at the core" of that purpose. *Butterworth v. Smith*, 494 U.S. 624, 632 (1990). Additionally, Doe and others who publish news "serve as a powerful antidote to any abuses of power by governmental officials," *Mills v. Alabama*, 384 U.S. 214, 219 (1966), and that speech may include "a significant amount of verbal criticism and challenge directed at [law enforcement] officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

That Doe chooses to conduct this expressive activity anonymously does not change the First Amendment analysis. The Supreme Court has been emphatic that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech." *McIntyre*, 514 U.S. at 342. The right to anonymity "is a shield from the tyranny of the majority" that stems from "an honorable tradition of advocacy and of dissent." *Id.* at 357. These rights are no less robust on the Internet, which is one of the "most important places . . . for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017); *see also Reno v. ACLU*, 521 U.S. 844, 870 (1997). Anonymity in this context thus "facilitates the rich, diverse, and far ranging exchange of ideas." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001).

**B.  The First Amendment Protects the Right to Record Law Enforcement and Publish That Recording.**

The First Amendment protects the right to "record law enforcement officers engaged in the exercise of their official duties in public places." *Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018) (citing *ACLU of Ill. v. Alvarez,* 679 F.3d 583, 597 (7th Cir. 2012)); *see also Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (videorecording policing of protest was exercising right to film "matters of public interest"); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (political protests); *Bernal v. Sac. Cnty. Sheriff's Dep't*, 73 F.4th 678, 699 (9th Cir. 2023) (outside of home); *Naveed v. City of San Jose*, Case No. 15-cv-05298-PSG, 2016 WL 2957147, at *5 (N.D. Cal. May 23, 2016) (outside of business). It also protects efforts to learn the identities of government agents as a means of accountability. "[D]emanding that the police identify themselves [is] a legitimate activity." *Knox v. Sw. Airlines*, 124 F.3d 1103, 1108 (9th Cir. 1997); *see Noble-Perez v. Robinson*, Case No. 8:22-cv-00037-JVS(JDEx), 2023 WL 6194265, at *11 (C.D. Cal. Aug. 16, 2023) (concluding that "filming with a cell phone" and "asking for [an officer's] name and badge number" is protected First Amendment activity).

As a corollary to the right to record law enforcement conducting business in public, it follows that the First Amendment also protects the right to broadcast such recordings. Just as "[r]ecording police encounters creates information that contributes to discussion about governmental affairs," so too does livestreaming, which "often creat[es] its own record." *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023); *see also Fields v. City of Phila.*, 862 F.3d 353, 358–59 (3d Cir. 2017); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

Here, Doe reposted another Instagram user's content showing a Border Patrol agent interacting with members of the public. *See* Doe Decl. ¶ 14 (linking to the original post). While this original post is undoubtedly protected (as just explained), Doe's repost is separately and additionally protected. In fact, the Supreme Court has held that the publication of lawfully-obtained truthful information concerning a matter of public significance cannot be punished "absent a need . . . of the highest order." *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979). Just as putting a campaign yard sign in one's yard conveys the message on that sign, *City of Ladue v. Gilleo*,

512 U.S. 43, 54—56 (1994), Doe's decision to repost the original Instagram post conveyed that communication to followers of @LBProtest. Doe Decl. ¶¶ 13–14; *cf. Rainsy v. Facebook, Inc.*, 311 F. Supp. 3d 1101, 1114—15 (N.D. Cal. 2018) ("Liking" a Facebook page is speech); *Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013) ("Liking" a post on Facebook is pure speech and symbolic expression protected by First Amendment). That Doe "may use a single mouse click to produce that message . . . instead of typing the same message . . . is of no constitutional significance." *Id.* At the same time, Doe's decision to exercise the right to repost content does not mean that Doe "believed in, and adopted, everything that they [posted]." *Flynn v. Cable News Network*, 621 F. Supp. 3d 432, 439 (S.D.N.Y. 2022) (Twitter retweet is "not necessarily an endorsement of the original tweet, much less an endorsement of the unexpressed belief system of the original tweeter").

### C.  The First Amendment Protects the Right to Publish the Identity of Law Enforcement Agents.

The First Amendment robustly protects the right to publish highly personal information about both government officials and private individuals on matters of public concern. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99 (1979); *Oklahoma Publ'g Co. v. Dist. Ct.*, 430 U.S. 308 (1977); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975); *Pubius v. Boyer–Vine.*, 237 F. Supp. 3d 997, 1016 (E.D. Cal 2017). This right applies with particular force to information concerning law enforcement agents. *See Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1249 (N.D. Fla. 2010); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135 (W.D. Wash. 2003). The "publication of truthful personal information about police officers is linked" to the interest of police accountability "through aiding in achieving service of process, researching criminal history of officers, organizing lawful pickets, and other peaceful and lawful forms of civic involvement that publicize the issue." *Brayshaw*, 709 F. Supp. 2d at 1249. Such records "are of interest to those connected with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Cox*, 420 U.S. at 495.

DHS's Subpoena is sparse, but it is pointed in one respect: it threatens criminal prosecution for an Instagram post containing an agent's name, likeness, and a reference to the three cities where the agent purportedly lived or worked. *See* Doe Decl. ¶ 14 (linking to the original post). But consistent with the foregoing authorities, Doe had a protected right to publish identifying information about the Border

1    Patrol agent in question. Again, "state action to punish the publication of truthful information seldom

2    can satisfy constitutional standards" when that information is about a "matter of public significance."

3    *Smith*, 443 U.S. at 102–03; *Bartnicki*, 532 U.S. at 527–28.

4          The First Amendment protection afforded to Doe's repost would be equally robust even if the

5    reposted content contained much more detailed personal information about the agent. Courts, for

6    example, have upheld the right of a blogger to publish the home addresses and phone numbers of

7    legislators. *Publius,* 237 F. Supp. 3d at 1016. And they have struck down criminal laws prohibiting the

8    publication of police officers' names, residential/home addresses, and social security numbers. *See*

9    *Brayshaw*, 709 F. Supp. 2d at 1248–49 (striking down criminal law and holding names and personal

10   addresses of police officers a matter of public significance); *Sheehan,* 272 F. Supp. 2d at 1150 (ruling

11   unconstitutional a statute that prohibited posting the detailed personal information of law enforcement).

12   Even if this case involved the publication of an undercover officer's identity (which it does not), the

13   First Amendment would protect the right to film and publicize it related to a matter of public concern.

14   *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1220 (10th Cir. 2007) (recognizing that "[p]ublicity of

15   undercover police officers" and their identities via TV broadcast was "a matter of public interest"

16   protected by First Amendment).

17         Here, the Border Patrol agent's identity is no secret. As the Instagram post demonstrates, the

18   officer wore a name tag that displayed his first initial and last name to the public. Doe Decl. ¶ 14.

19   Anyone seeing the name tag on the Border Patrol agent would be able to use "routine newspaper

20   reporting techniques to ascertain the identity" of that person. *Smith*, 443 U.S. at 103; *Four Navy Seals v.*

21   *Associated Press*, 413 F. Supp. 2d 1136, 1141 (S.D. Cal. 2005) (photos located via Google search).

22   DHS's attempt to threaten criminal liability for Doe's repost strikes at Doe's First Amendment right to

23   publish personal information about a government agent conducting operations in Southern California.

24         Doe's @LBProtest account and the repost targeted by the Subpoena are focused on a matter of

25   widespread political and social interest—the ongoing immigration raids and DHS enforcement efforts.

26   Each image in the video—including the Officer's purported name, likeness, and facial expressions—

27   form an "integral part of the story" in Doe's mission to give community members awareness of

28   government actions in the community. *Four Navy Seals*, 413 F. Supp. 2d at 1146 (publishing facial

---

expressions of Navy Seals photographed with Iraqi captives are a legitimate public concern). The First Amendment protects Doe's right to publish this information, which informs democratic debate and efforts to seek accountability.

### D. The First Amendment Protects Doe's Right to Interact with Online Content, Curate a Feed for Followers, and Associate with Others.

The rough and tumble of the online social media environment, with an avalanche of content and instant reactions, may not bear much superficial similarity to reasoned discourse. But that cacophony of voices nevertheless constitutes speech that sits within the core of the First Amendment's protections.

The process of curating a feed, reposting third-party content, and interacting with the community of viewers, followers, and readers on the Internet is subject to First Amendment protection. Compiling material into a stream of posts (e.g., on Instagram) requires making decisions about "the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). That activity, in turn, "results in a distinctive expressive product." *Id*. The resulting expressive product cannot be burdened—by an administrative subpoena for example—when the government disapproves of some portion of content in the compilation. *Id.* at 742 ("[T]he State cannot advance some points of view by burdening the expression of others.") (citing *Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 20 (1986)).

Just as platforms design their systems to curate feeds for users, so too do individual creators curate feeds. They do so by posting their own content and reposting the content of third parties. These curated feeds are themselves protected by the First Amendment, and they often reflect a person's deep interests and beliefs related to society, ethics, politics, humor, and art. And those curation decisions reflect the results of expressive judgments, editorial and otherwise, that have long been protected by the First Amendment. *See Moody*, 603 U.S. at 709 (citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 185, 189–190 (1997) (compilation of third-party speech into a repertoire of cable programming was expressive) and *Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, Inc*., 515 U.S. 557 (1995) (selection of participants in a parade was expressive)).

These precedents reflect that Doe's curation of others' original content in the @LBProtest feed is entitled to protection. Doe includes content in the @LBProtest feed for a wide variety of reasons, including that Doe considers the content interesting, worth viewing, humorous, unusual, surprising, and, at times, upsetting. Doe Decl. ¶ 10. As courts have found, any repost or "retweet" of such content is "not necessarily an endorsement of the original." *Flynn,* 621 F. Supp. 3d at 439. The Subpoena targeting of @LBProtest based on its reposting of content on social media chills the exercise of this kind of protected expressive activity.

### E.  Given the First Amendment Rights at Stake, the Subpoena Fails to Meet the High Threshold for Compelling Disclosure of Doe's Identity.

Because the foregoing demonstrates that the Subpoena "intrudes" on numerous fundamental First Amendment rights, DHS must—as set forth above—"convincingly"—show a substantial relation between the information sought and a subject of overriding and compelling state interest." *Gibson*, 372 U.S. at 546. Said another way: where, as here, "governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests." *Bursey*, 466 F.2d at 1083. DHS must also satisfy the separate and well-established legal test for exposing the identity of an anonymous speaker in the Northern District. *See Highfields*, 385 F. Supp. 2d 969. For numerous reasons, DHS cannot satisfy either of these exacting tests.

***First***, the Subpoena fails to identify a government interest—let alone a *compelling* government interest—to warrant disclosure of the "subscriber names, e-mails, and telephone numbers" associated with @LBProtest. The Subpoena's vague reference to a "criminal investigation involving officer safety" does not conjure the compelling interest needed to invade Doe's rights. Not only is the speech targeted by the Subpoena protected and thus insufficient to give rise to a criminal investigation, *see supra* sections I.A-D, DHS must do more than simply claim a general interest in enforcing the law when issuing a subpoena with such serious First Amendment implications. "Governmental action does not automatically become reasonably related to the achievement of a legitimate and substantial government purpose by mere assertion." *Bates v. City of Little Rock*, 361 U.S. 516, 525 (1960). DHS may be

offended by the contents and viewpoint posted on the @LAProtest feed, but just because it "dislike[s] being the object of abusive language," does not mean that the government is permitted "to use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1174 (9th Cir. 2013).

**Second**, to the extent that DHS intends to rely on the Subpoena's unsubstantiated reference to "Officer Safety/Doxing," that interest will not override Doe's First Amendment rights. Publishing the "names, addresses, and numbers" of law enforcement is lawful and does not constitute "doxing." *See Sheehan*, 272 F. Supp 2d at 1143; *see also Brayshaw*, 709 F. Supp. 2d at 1249 ("Defendant cites no authority for the proposition that truthful, lawfully-obtained, publicly-available personal identifying information constitutes any mode of constitutionally proscribable speech."). Indeed, caselaw makes clear that the publication of officers' names and likenesses maintains its protection "***even if*** publishers are aware that their actions could result in third parties making threats to the individuals identified in the news"—facts that are not present here. *Alvarado*, 493 F.3d at 1210 (emphasis added).

**Third**, none of the First Amendment's narrow exemptions for speech that constitutes a "true threat" or an "incitement to violence" apply. These exemptions allow the government to punish threatening expression only if the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," *Virginia v. Black*, 538 U.S. 343, 359 (2003); or if the "advocacy is directed to inciting or producing ***imminent*** lawless action and is ***likely*** to incite or produce such action," *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (emphasis added). Measured against these standards even the original post that Doe reposted (which was not an endorsement, *see Flynn*, 621 F. Supp. 3d at 439) did not cross over into unprotected territory. That original post had been labeled "WARNING" and stated that the Border Patrol agent's bad operational security ("OpSec") put him and his "whole crew at risk." *See* Doe Decl. ¶ 14 (including link to post). Such content is still within the First Amendment's broad sweep. *See, e.g., Watts v. United States*, 394 U.S. 705, 706–08 (1969) (classifying as protected the statement "if they ever make me carry a rifle the first man I want in my sights is LBJ"); *United States v. Bagdasarian*, 652 F.3d 1113, 1123 (9th Cir. 2011) (classifying as protected a message board post saying President Obama will "have a 50

cal in the head soon"); *see also Brandenburg*, 395 U.S. at 446–48 (ruling that a state law failed First Amendment scrutiny when applied to punish the televised speech of a Klu Klux Klan leader who spoke before an armed group threatening "revengeance" against the President, Congress, and the Supreme Court).

**Fourth**, absent an overriding and compelling interest, the Subpoena lacks a "substantial relation" to evaluate if and why Doe's identity, associations, and other personal information must be revealed. In the context of compelled disclosures to reveal associational connections, such a "substantial relation is necessary but not sufficient to ensure that the government adequately considers the potential for First Amendment harms before requiring that organizations reveal sensitive information about their members and supporters." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The Subpoena fails to make such a showing. It does not demonstrate how Doe's identity—or the identity of any Instagram account user who created or reposted the post at issue—could substantially relate to a "criminal investigation involving officer safety" or "officer safety/doxing." Again, the Instagram post, its contents, and the actions taken by Doe and others sharing it, are constitutionally protected and consequently cannot give rise to a criminal investigation or charge that warrants the disclosure DHS demands. *See Gibson¸* 372 U.S. at 557 (holding unconstitutional a state legislative subpoena demanding identity information about members of a civil rights organization); *Bursey,* 466 F.2d at 1085 (demands for identities of people who worked on newspaper and pamphlets infringed associational privacy under First Amendment).

**Finally,** DHS cannot satisfy the Northern District's separate test for exposing an anonymous speaker as articulated in *Highfields Cap. Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005).[13] This test requires courts to "go beyond the pleadings to determine if there is an evidentiary basis for

---

[13] District courts in the Ninth Circuit and across the U.S. routinely apply *Highfields* and tests echoing it to ensure that the identities of anonymous online speakers are not revealed without parties providing an adequate showing and considering the interests of all parties. *See, e.g., In re DMCA § 512(h) Subpoena to Twitter, Inc*., 608 F. Supp. 3d at 876; *Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp*., No. 12-CV-10803, 2014 WL 10319321 *5 (E.D. Mich. July 2, 2014); *Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 132 (D.D.C. 2009); *but cf. Doe v. S.E.C*., No. C 11-80209 CRB, 2011 WL 5600513 at *1, *3 n.3 (N.D. Cal. Nov. 17, 2011) (applying *Brock v. Local 375, Plumbers Int'l Union*, 860 F.2d 346, 350 (9th Cir. 1988) to assess a request to identify an anonymous commercial speaker)*.

concluding that the requested discovery is appropriate." *In re PGS Home Co. Ltd*, No. 19-MC-80139-JCS, 2019 WL 6311407 *5 (N.D. Cal. Nov. 25, 2019) (citing *Highfields*, 385 F. Supp. 2d at 975). The party seeking the disclosure must demonstrate "a prima facie case on the merits of its underlying claim," and then the "court must balance[] the need for the discovery against the First Amendment interest at stake." *In re DMCA § 512(h) Subpoena to Twitter, Inc*., 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022) (citing *Dendrite Int'l, Inc. v. Doe No. 3,* 775 A.2d 756, 760–61 (N.J. Super. Ct. App. Div. 2001); *Highfields*, 385 F. Supp. 2d at 974–75). DHS has not demonstrated a prima facie case for any underlying allegation. Additionally, DHS's failure to meet its burden under the first step of *Highfields* compels the conclusion that it lacks the prerequisite "need for the discovery" sought in the Subpoena. *See Highfields*, 385 F. Supp. 2d at 974–75. This, in turn, confirms that DHS cannot demonstrate the compelling government interest required by *Gibson*.

*    *    *

In sum, exposing Doe's identity serves no substantial relation to a legitimate investigative purpose and will not further an overriding or compelling government interest. The Subpoena should be quashed because it violates Doe's First Amendment rights. It threatens to irreversibly extinguish Doe's anonymity and risks exposing Doe and others to "reprisals and other forms of public hostility" that hinder the exercise of First Amendment rights. *Gibson*, 372 U.S. at 570 ("[W]hether a group is popular or unpopular, the right of privacy implicit in the First Amendment creates an area into which the Government may not enter."); *see also Americans for Prosperity Found.*, 594 U.S. at 606–07 (the Supreme Court noted "the vital relationship between freedom to associate and privacy in one's associations") (citing *N.A.A.C.P v. Alabama*, 357 U.S. 449, 462 (1958)).

## II.    The Subpoena Should Be Quashed Because It Exceeds DHS's Statutory Authority.

An administrative subpoena is improper if it seeks records beyond the scope of an investigation authorized by the enabling statute. *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 643 (5th Cir. 1993). An administrative subpoena likewise cannot seek records to see whether they "may reveal other wrongdoing, as yet unknown" when there is "no statutory authority to support this unlimited claim of investigatory power." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418–19 (D.C. Cir. 1994). Measured against this rubric, none of the two possible sources of authority cited in the

1    Subpoena—8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4—permit DHS to compel disclosure of Doe's

2    identity for the purpose of investigating so-called "officer safety" or "doxing" without reference to any

3    criminal provision underlying the investigation. To permit DHS to move forward with the Subpoena

4    would be *ultra vires*.

5       **A.   8 U.S.C. § 1225(d) Does Not Permit Subpoenas to Third Parties That Would Reveal**

6             **the Identity of Unknown Individuals.**

7           Subpoenas under Section 1225(d) are not a proper vehicle for revealing the identities of

8    unknown individuals, even when those people are suspected of having done something unlawful (which

9    Doe is not suspected of). In *Peters v. United States*, 853 F.2d 692, 693–94 (9th Cir. 1988), the Ninth

10   Circuit held that Section 1225(d)[14] did not authorize the Immigration and Naturalization Service to issue

11   a subpoena to reveal the identity of individuals living at a labor camp using a "John Doe subpoena." A

12   "John Doe subpoena" is a "third-party subpoena[] . . . where the INS's investigation and request for

13   information concerns individuals whose identity is currently unknown to the INS." *Id*. at 695 n.3.

14          The court quashed the subpoena, reasoning that, because Section 1225(d) did not include specific

15   authorization to issue John Doe subpoenas and because no procedural safeguards existed in the statute to

16   cabin the issuance of these subpoenas, the court would not "infer such authority in the otherwise broad

17   grant of authority in 8 U.S.C. § 1225(a)." *Id.* at 695, 699.

18          The *Peters* court's reluctance to grant the government authority not explicitly authorized by

19   statute arose out of concern in Congress for the civil rights and privacy impacts of John Doe subpoenas.

20   *See id*. at 697. Further exacerbating the court's concern was Section 1225's lack of procedural

21   safeguards which could protect third parties at risk of being identified by the government. *Id*. at 698

22   ("By requiring district court authorization before the IRS could issue John Doe summonses, Congress

23   sought to allay its concern that [a case interpreting the IRS Act] did not provide sufficient restraints on

24   the IRS's exercise of its summons power."). Those concerns led the court to conclude that Section

25   1225(d) "clearly does not reflect the same language, authorization, safeguards, or policy underpinnings

26   from which we can reasonably infer that Congress intended the INS to possess the authority to issue

27   John Doe subpoenas." *Id*.

28

---

[14] When *Peters* was decided the subpoena authority was set forth in 8 U.S.C. § 1225(a).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO QUASH ADMINISTRATIVE
SUBPOENA                                16                      Misc. Case No._____

1    DHS has sought to expose the identities of anonymous users beyond the scope of its statutory

2    authority before. The DHS customs summons statute, 19 U.S.C. § 1509, confers limited authority in

3    customs investigations to seek records related to the importation of merchandise, including the

4    assessment of customs duties. But a 2017 report by the DHS Inspector General found that the Customs

5    and Border Patrol Office of Professional Responsibility had misused that authority when it demanded

6    records that would identify an anonymous Twitter user, because those records are not related to

7    importation of merchandise (as, for example, shipping manifests are).[15] DHS concluded that Customs

8    and Border Patrol "may have exceeded the scope of its authority" and that it "regularly" issued customs

9    summonses "in violation of [agency] policy."[16] That improper attempt to identify a Twitter user

10   (associated with the @ALT_USCIS account) was the subject of a complaint by Twitter in federal court,

11   and DHS subsequently withdrew the summons.[17]

12        Because third-party subpoenas to reveal people's identities are unavailable under Section

13   1225(d), the motion to quash should be granted.

14        **B.  The Purported Investigation Into "Officer Safety" Is Outside the Authority of**

15        **8 U.S.C. § 1225(d) and 8 C.F.R. § 287.4.**

16        Even if third-party "John Doe" subpoenas were permissible in some instances, statutory

17   authority does not authorize DHS to issue a subpoena in connection with an investigation into alleged

18   "officer safety" or "doxing." First, 8 U.S.C. § 1225(d) cannot support issuance of the Subpoena. Section

19   1225(d) authorizes immigration officers to issue subpoenas "relating to the privilege of any person to

20   enter, reenter, reside in, or pass through the United States or concerning any matter which is material

21   and relevant to the enforcement of this chapter and the administration of the Service." The "chapter"

22   referenced relates to Chapter 12 of Title 8, which has five Subchapters: Subchapter I—General

23   Provisions (setting forth definitions and powers of officials); Subchapter II—Immigration (setting forth

24   who may enter, the allocation and issuance of visas, admission of refugees, and the asylum process);

25   Subchapter III—Nationality And Naturalization (setting forth how a person may be deemed a citizen as

26   ─────────────

27   [15] John Roth, *Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509*, Department of Homeland Security (Nov. 16, 2017) available at https://perma.cc/BDR2-U69D.
[16] *Id.* at 3, 4.

28   [17] *Id.* at 2. Twitter's complaint resisting the unmasking of the anonymous account is available at https://perma.cc/6HZD-WCD4.

well as how citizenship may be lost); Subchapter IV—Refugee Assistance (setting forth the

appropriations for helping refugees); Subchapter V—Alien Terrorist Removal Procedures (setting forth

the process for removing those designated as an "alien terrorist."). These subchapters do not provide for

the authority for DHS to investigate real or imagined threats to officer safety, and the power to issue

subpoenas is explicitly constrained to the scope of the Chapter. No allegations appear in the Subpoena to

substantiate or explain the nature of the threats to "officer safety" and no criminal provisions are cited.

The second listed authority for the Subpoena fares no better. The authority to issue subpoenas for

investigatory purposes under Section 1225(d) is "created solely by statute*." Peters,* 853 F.2d at 696.

Under 8 C.F.R. § 287.4, certain immigration officers "may issue a subpoena requiring the production of

records and evidence for use in criminal or civil investigations." But those "criminal or civil

investigations" cannot (and do not) encompass all violations of criminal and civil law; rather, they

encompass those criminal and civil violations that the officers are empowered to conduct.

8 C.F.R . § 287.2 (allowing agents, with "reason to believe that there has been a violation punishable

under any criminal provision of the immigration and nationality laws administered or enforced by the

Department" to open an investigation.).

The "violations punishable under any criminal provision of the immigration and nationality

laws" include a variety of criminal offenses, including improper entry into the United States (8 U.S.C.

§ 1325), improper reentry into the United States after removal (8 U.S.C. § 1326), aiding or assisting

others to enter the United States (8 U.S.C. § 1327), and certain kinds of document fraud (8 U.S.C.

§ 1324c). But the Immigration and Nationality Act does not empower immigrations officers to

investigate all federal crimes.

The criminal provisions enumerated in the Immigration and Nationality Act stands in stark

contrast to the expansive set of federal crimes defined in Title 18 of the United States Code. The

prosecutorial and investigative authority in Title 18 encompasses an immense variety of criminal

provisions, spanning from prohibitions against wildlife refuge disturbances to securities fraud. *See, e.g.*,

18 U.S.C. §§ 41 (disturbance of wildlife refuges), 1301 (importing or transporting lottery tickets), 1348

(securities and commodities fraud), 1852 (removing timber from public land). The investigation and

prosecution of crimes such as these are naturally within the authority of federal law enforcement.

1   Immigration officers are not, under the Code of Federal Regulations, empowered to investigate every

2   fathomable violation of federal criminal law.

3          Whatever DHS's concerns might be with respect to the real or imagined threats to "officer

4   safety," those concerns, and any criminal investigations associated with those perceived threats, are not

5   among the criminal violations that arise under the Immigration and Nationality Act. The subpoena

6   authority in 8 C.F.R. 287.4, cannot support issuance of the Subpoena.

7   **III.    The Court Should Decide This Motion as Soon as Possible.**

8          Doe respectfully requests that this motion be heard and decided as quickly as possible. In the

9   typical case where a government agency issues an administrative subpoena seeking records, the urgency

10  of judicial review to protect a person's privacy may not be present. But in cases, such as this one, where

11  "an administrative subpoena is directed to a party other than the holder of a privacy interest in the

12  targeted items, the rights-holder will often *not* be afforded an opportunity to object on constitutional

13  grounds," and—unless the recipient has a reason to resist it—the subpoena will be "for all practical

14  purposes self-executing." *Hell's Angels Motorcycle Corp. v. Cnty. of Monterey*, 89 F. Supp. 2d 1144,

15  1151 (N.D. Cal. 2000).

16         The need to protect Doe's anonymity is urgent and profound because Meta has committed to

17  revealing Doe's identity to DHS unless Doe seeks relief in court. Specifically, on September 9, 2025,

18  Meta stated in an email that Doe must "provide[] [Meta] with a file stamped copy of [a] motion to

19  quash" by September 19, 2025, or it "will be required to respond to the legal process." Doe Decl. ¶ 19.

20  Doe is thus in immediate danger of having their personal information shared with DHS, and therefore in

21  danger of being targeted for harassment, detention, and persecution. Any persecution of Doe would be

22  baseless, unlawful, and unjust, but could still cause a great deal of irreparable harm. Doe has seen how

23  others have been unfairly and illegally targeted and harmed by the United States government. *See supra*

24  note 4. The risk of being targeted in that way by the United States government is terrifying. Doe Decl.

25  ¶¶ 21–22.

26         To the extent that DHS might argue the Court should defer a ruling until DHS decides to seek

27  enforcement of the administrative subpoena, DHS is wrong. Doe has a privacy interest and no

28  reasonable opportunity for an adversarial proceeding to object to Meta's willingness to cooperate with

1    the Subpoena—a situation which entitles Doe to pre-enforcement judicial determination. *See Hell's*

2    *Angels*, 89 F. Supp. 2d at 1153. Doe is at the mercy of Meta's whim and this Court's intervention is the

3    only process that can protect Doe. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 153 (1967) (legal

4    issue may be fit for pre-enforcement review where review is not otherwise precluded by law and

5    withholding judicial consideration would result in undue hardship) (abrogated on other grounds by

6    *Califano v. Sanders*, 430 U.S. 99 (1977); *cf. Wearly v. Fed. Trade Comm'n*, 616 F.2d 662, 666–68 (3d

7    Cir. 1980) (applying trilogy of *Abbott Laboratories* cases to find that pre-enforcement review of

8    subpoena was not yet ripe because the plaintiff-recipient had failed to explain how non-compliance

9    would place him on the "horns of a dilemma").

10            If Meta complies with DHS's demand, Doe's loss of anonymity would be irreversible.

11    "Anonymity, once lost, cannot be regained." *Rancho Publ'ns v. Superior Court*, 68 Cal. App. 4th 1538,

12    1541 (1999); *Does I thru XXIII v. Adv. Textile Corp.*, 214 F.3d 1058, 1072 (9th Cir. 2000) (observing

13    that the "question whether plaintiffs may use pseudonyms will be moot" if forced to reveal names in

14    litigating anonymity). Here, Doe's dilemma is real, and Doe's fear of persecution is neither imagined

15    nor exaggerated. The reference to "officer safety" in the Subpoena occurs in the context of the Trump

16    administration's public statements equating the recording of ICE agents with violence against law

17    enforcement officers.[18] The government's threats to do not merely draw a parallel between violence and

18    constitutionally speech, the government has stated its intent to prosecute individuals for engaging in

19    speech like Doe's "to the fullest extent of the law."[19] This court's urgent intervention is necessary to

20    protect Doe's fundamental Constitutional rights and prevent the government from trying to silence

21    speech it does not favor.

22

23

24

25    [18] Forbes Breaking News, *Kristi Noem Claims Videotaping ICE Agents Is 'Violence' Following Camarillo, California Farm Raids*, at 00:21 (YouTube, July 12, 2025),

26    https://www.youtube.com/watch?v=uDFX4q6huH8 ("[V]iolence is anything that threatens [ICE agents] and their safety, so it is . . . videotaping them, where they're at, when they're out on operations.")

27    [19] Matthew Cunningham-Cook, *DHS Says Masking and Posting Videos of ICE Agents is "Violence,"* Exposed by the Center for Media and Democracy (Sep. 9, 2025), https://perma.cc/2C94-HU7M;

28    *Anarchists and Rioters in Portland Illegally Dox ICE Officers and Federal Law Enforcement*, Department of Homeland Security (July 11, 2025), https://perma.cc/W52R-48X3.

1

## CONCLUSION

2     For the reasons stated above, Doe requests that the Court issue an order quashing the Subpoena

3   in its entirety with respect to all referenced Instagram accounts.

4

5

6   Dated: September 18, 2025                    Respectfully submitted,

7

8                                                 AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                                  OF NORTHERN CALIFORNIA, INC.
9

10                                                */s/ Jacob Snow*
                                                  Jacob Snow (SBN 270988)
11                                                Matthew T. Cagle (SBN 286101)
                                                  Nicolas A. Hidalgo (SBN 339177)
12                                                Chessie Thacher (SBN 296767)
                                                  Angelica Salceda (SBN 296152)
13                                                Grayce Zelphin (SBN 279112)

14
                                                  *Attorneys for Movant J. Doe*
15

16

17

18

19

20

21

22

23

24

25

26

27

28